ACCEPTED
07-15-00013-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
6/9/2015 5:07:15 PM
Vivian Long, Clerk

No. 07-15-00013-CR

**IN THE**

**COURT OF APPEALS FOR THE**

**SEVENTH SUPREME JUDICIAL DISTRICT**

**SITTING AT AMARILLO, TEXAS**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
6/9/2015 5:07:15 PM
VIVIAN LONG
CLERK

_____

JOSHUA MARQUES WILLIS,

*APPELLANT*

V.

THE STATE OF TEXAS

_____

AN APPEAL OF A CONVICTION FOR

ROBBERY (ENHANCED)

CAUSE NO. 2013-384-C1

FROM THE 19TH JUDICIAL DISTRICT COURT OF

MCLENNAN COUNTY, TEXAS

_____

**STATE'S BRIEF**

_____

ABELINO "ABEL" REYNA
Criminal District Attorney
McLennan County, Texas

STERLING HARMON
Appellate Division Chief
State Bar No. 09019700

219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
sterling.harmon@co.mclennan.tx.us

i

# Identity of Parties and Counsel

**Appellant**                               Joshua Marques Willis

**Appellant's Trial Attorneys**             Mr. Russell Hunt
                                            Ms. Michelle Tuegel
                                            P.O. Box 726
                                            Waco, Texas  76703

**Appellant's Attorney on Appeal**          Mr. John M. Hurley
                                            427 North 38th Street
                                            Waco, Texas  76710

**State's Trial Attorneys**                 Mr. Robert Moody
                                            Mr. Evan O'Donnell
                                            Assistant Criminal District
                                            Attorneys
                                            219 North 6th Street, Suite 200
                                            Waco, Texas 76701

**State's Attorney on Appeal**              Abelino 'Abel' Reyna
                                            Criminal District Attorney
                                            Sterling Harmon
                                            Appellate Division Chief
                                            219 North 6th Street, Suite 200
                                            Waco, Texas 76701

# Table of Contents

**Identity of Parties and Counsel** ................................................................ ii

Table of Contents .................................................................................... iii

TABLE OF AUTHORITIES ...................................................................... v

Issues Presented ....................................................................................vii

Statement of Facts ...................................................................................1

    Jury Selection ................................................................... 1

    Guilt Phase ...................................................................... 6

    Jury Charge ...................................................................... 12

    Closing Argument ............................................................ 13

    Punishment Phase ............................................................ 13

    Punishment Argument ...................................................... 14

Summary of Argument ........................................................................ 14

Argument ............................................................................................ 15

    Batson Challenge ............................................................. 15

    Jury Charge Error ............................................................ 19

    Improper Argument ......................................................... 21

Prayer .................................................................................................. 24

Certificate of Compliance .....................................................................25

Certificate of Service .............................................................................25

# TABLE OF AUTHORITIES

**Federal Opinions**

*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712,
90 L. Ed. 2d 69 (1986)……………………………… vi, 2, 4, 6, 14, 15, 16, 17

*Purkett v. Elam*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed. 2d 834 ……….. 15

*Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203,
170 L.Ed. 2d 175 (2008) ……………………………………………. 15

**Texas State Opinions**

*Allen v. State*, 253 S.W 3d 260 (Tex. Crim. App. 2008) …………………. 19

*Brown v. State*, 270 S.W. 3d 564 (Tex. Crim. App. 2008) ……………….. 22

*Bufkin v. State*, 207 S.W. 3d 779 (Tex. Crim. App. 2006) ………………. 19

*Gaddis v. State*, 753 S.W. 2d 396 (Tex. Crim. App. 1988) ………………. 22

*Garcia v. State*, 126 S.W. 3d 921 (Tex. Crim. App. 2004) ………………... 22

*Grant v. State*, 325 S.W. 2d 655 (Tex. Crim. App. 2010) ……………. 17, 18

*Juarez v. State*, 308 S.W. 3d 398 (Tex. Crim. App. 2010) …………………. 19

*Keeton v. State*, 749 S.W. 2d 861 (Tex. Crim. App. 1988) ……………. 17, 18

*King v. State*, 919 S.W. 2d 819 (Tex. App. – El Paso 1996, *no pet*.) …… 20, 21

*Martinez v. State*, 17 S.W. 3d 677 (Tex. Crim. App. 2000) ………………... 23

*Miller v. State*, 666 S.W. 2d 564
(Tex. App. – Houston [14th Dist.] 1984, *no pet*.) …………………… 20, 21

*Mosley v. State*, 983 S.W. 2d 249 (Tex. Crim. App. 1998) …………………. 23

*Ngo v. State*, 175 S.W. 3d 738 (Tex. Crim. App. 2005) ……………………. 19

*Shaw v. State*, 243 S.W. 3d 647 (Tex. Crim. App. 2007) ………………….. 19

*Thibodeaux v. State*, 726 S.W. 2d 601
(Tex. App. – Houston [14th Dist.] 1987, *pet. ref'd*) ………………….. 20, 21

*Vargas v. State*, 838 S.W. 2d 552 (Tex. Crim. App. 1992) …………………. 17

*Watkins v. State*, 245 S.W. 3d 444 (Tex. Crim. App. 2008) ………………... 15

*Wesbrook v. State*, 29 S.W. 3d 103 (Tex. Crim. App. 2000) …………………. 19

*Whitsey v. State*, 796 S.W. 2d 707 (Tex. Crim. App. 1990) …………….. 17, 18

*Young v. State*, 283 S.W. 3d 854, 866 (Tex. Crim. App. 2009) …………….. 15

**Texas Statutes**

*Tex. Penal Code* §1.07(a)(42)  ……………………………………………… 20, 21

*Tex. Penal Code* §8.02(a)  …………………………………………….. 20, 21

**Rules**

*Tex. R. App. P. 9.4(e)*  ..................................................................... 25

*Tex. R. App. P. 9.4(i)*  ..................................................................... 25

*Tex. R. App. P. 9.4(i)(1)*  ................................................................ 25

*Tex. R. App. P. 44.2(b)*  …………………………………………….. 23

*Tex. R. Evid. 403*  ........................................................................... 10

*Tex. R. Evid. 404(b)*  ...................................................................... 10

## Issues Presented

*Appellant's Issue One*:

Whether the trial court correctly overruled Appellant's *Batson* challenge to the manner in which the State exercised its peremptory jury strikes.

*Appellant's Issue Two:*

Whether the trial court erred in denying Appellant's request that the jury charge include an instruction on "mistake of fact."

*Appellant's Issue Three:*

Whether the trial court erred in overruling Appellant's objection to the prosecutor's argument against allowing the Appellant to "walk[] out [of] this courthouse with you?"

*Appellant's Issue Four:*

Whether the trial court erred in overruling Appellant's objection to the prosecutor's argument that the reason Appellant committed the offense was, "[M]aybe there was dope in the car."

## Statement of Facts

Appellant was indicted for the second degree felony offense of Robbery. (CR I – 6). The indictment charged that Appellant, "while in the course of committing theft of property, and with intent to obtain and maintain control of said property, intentionally or knowingly cause bodily injury to Ernesto Lopez by striking him." (CR I – 6). The indictment also contained an enhancement allegation of a prior felony conviction, raising the punishment level to a first degree felony. (CR I – 6). Jury trial was held in the 19th District Court of McLennan County, Texas on December 9-11, 2014.

## Jury Selection

Venireperson 1 was Katherine Diann Fabian. (CR I – 106). State's counsel asked Ms. Fabian when she looked at Appellant, "what's the first thing you think?" (RR IV – 38). Ms. Fabian's response was that Appellant was sitting there, "waiting to see what we're going to do." (RR IV – 38).

The State's attorney proposed to the panel three theories of assessing punishment: 1) punishment for punishment's sake; 2) deterrence; and 3) rehabilitation. (RR IV – 123-124). He then asked individual panelists to rank their top two punishment theories. (RR IV – 124). Ms. Fabian ranked "deterrence" and "rehabilitation" as her top two punishment considerations. (RR IV – 124).

Appellant's counsel asked the panel to tell her a strength and a weakness each of them had. (RR IV – 180). Ms. Fabian said she was "a

good teacher, and I'm terrible with money." (RR IV – 180). Appellant used a peremptory strike on Ms. Fabian. (CR I – 106).

Laura Washington Anderson was Venireperson 14. (CR I – 106). When asked by State's counsel how someone could know something beyond all doubt, Ms. Anderson replied, "That would be very difficult. There's no way you could know that." (RR IV – 47). Ms. Anderson indicated that she would want to know the Appellant's criminal history in assessing punishment. (RR IV – 114). She ranked "punishment for punishment's sake" and "rehabilitation" as her top two punishment considerations. (RR IV – 125). Ms. Anderson named "punctuality" and "caring too much" as her strengths and weaknesses. (RR IV – 182). The State exercised a peremptory strike on Ms. Anderson, which was the subject of Appellant's *Batson* challenge. (CR I – 109).

Laurie Martin Guest was Venireperson 15. (CR I – 106). She agreed with the proposition that the standard of proof could not be beyond all doubt since one "can never have certainty in our world." (RR IV – 47). She said "I think you have to look at all the facts." (RR IV – 47). Ms. Guest had previously served on a criminal jury in a case where the judge had assessed punishment. (RR IV – 94). Her top punishment considerations were "punishment for punishment's sake" and "rehabilitation." (RR IV – 125). Ms. Guest responded to defense counsel's question to the panel as to who watched shows like *Oprah* and *Jerry Springer*. (RR IV – 131). She agreed with defense counsel's assertion that people on those shows spoke up and

weren't afraid to speak their minds. (RR IV – 131). She also volunteered that she had served on a jury case tried by former prosecutor Beth Toben. (RR IV – 132-133). The jury had assessed punishment on that case. (RR IV – 133). When asked by Appellant's counsel if she afforded police officers more credibility that other witnesses, Ms. Guest said she would have to "listen to the facts on both sides to make my decision." (RR IV – 163). Evaluating her strengths and weaknesses, Ms. Guest said, "I teach. I'm a patient, compassionate person, and my weakness would probably be maybe caring too much or overworking." (RR IV – 182-183). The State used a peremptory strike on Ms. Guest. (CR I – 109).

Rolanda Wyette Brooks was Venireperson 29. (CR I – 107). State's counsel asked panelists how they judged whether someone they had never met was being truthful. (RR IV – 51). Ms. Brooks said, "I don't know how I could prove they were guilty or innocent, just listen to them and see what their side is to see if they – if I can help them to talk to them to see where we can be at, and then I can't say they're innocent or guilty until they're proven." (RR IV – 52-53). Ms. Brooks had had a family member arrested for drugs, they had been treated fairly, and it would not cause her a problem. (RR IV – 76, 82). She rated her punishment considerations as "punishment for punishment's sake" and "rehabilitation." (RR IV – 126). When defense counsel asked the panelists whether they made decisions more with their head or their heart, Ms. Brooks said she used both. (RR IV – 176-177). Evaluating her strengths and weaknesses, Ms. Brooks

3

considered organization to be her strength and hard work to be her weakness. (RR IV – 189). Expanding on her answer, Ms. Brooks said she was hardworking and demanding of perfection. (RR IV – 189). She expected perfection from the State and the defense. (RR IV – 189). Appellant posed a *Batson* challenge to the State's peremptory strike of Ms. Brooks. (CR I – 110).

Darrell Lee Selke was Venireperson 31. (CR I – 107). He had previously served on a criminal jury where the jury assessed punishment. (RR IV – 95). He rated "punishment for punishment's sake" and "rehabilitation" as his top punishment considerations. (RR IV – 126). Mr. Selke worked as a teacher in Mart, where he coached football. (RR IV – 154, 190). He used both his head and his heart in making decisions. (RR IV – 177). Mr. Selke considered integrity to be his strength and impatience as his weakness. (RR IV – 189). No strikes were exercised on Mr. Selke and he served on the jury. (CR I – 105).

Ashley Dawn Bass was Venireperson 46. (CR I – 108). She raised her hand when the panel was asked if they wanted to serve on the jury. (RR IV – 37). She thought that jury service would be exciting and interesting. (RR IV – 173). Ms. Bass' punishment considerations were "punishment for punishment's sake" and "rehabilitation." (RR IV – 128). She had heard of people being wrongfully convicted on TV. (RR IV – 165-166). Ms. Bass used her head to make decisions. (RR IV – 178). She considered her

strength to be "smart" and her weakness to be "organization."  (RR IV – 193).  The State used a peremptory strike on Ms. Bass.  (CR I – 111).

Darla Renae Yates was Venireperson 55.  (CR I – 108).  The State's counsel directed his explanation of affirmative defenses toward Ms. Yates, but did not engage her in conversation about the topic.  (RR IV – 111-112).  She rated "punishment for punishment's sake" and "rehabilitation" as her top punishment considerations.  (RR IV – 128).  On separate occasions, Ms. Yates' mother and father had had items stolen from their cars, but she didn't think those incidents would affect her.  (RR IV – 148).  Ms. Yates made decisions with both her heart and head.  (RR IV – 179).  Her strength was being organized and her weakness was being hardheaded.  (RR IV – 195).  Both parties used strikes on Ms. Yates.  (CR I – 108, 111).

Mark Tracey Arp was Venireperson 56.  (CR I – 108).  Mr. Arp's son had been charged with theft, and was not treated fairly.  (RR IV – 90).  The State's attorney and Mr. Arp discussed at some length why a defendant would opt for a jury to assess his punishment rather than the judge.  (RR IV – 112-113).  Mr. Arp's son and sister had both been assault victims.  (RR IV – 141).  Mr. Arp had done "drug enforcement" work for Brown & Root.  (RR IV – 156).  His brother and nephew were peace officers.  (RR IV – 160).  Mr. Arp made decisions with his head.  (RR IV – 179).  Being a provider was Mr. Arp's strength and being an enabler was his weakness.  (RR IV – 195).  The State exercised a peremptory strike against Mr. Arp.  (CR I – 111).

After peremptory strikes were made, Appellant made a *Batson* challenge to the State's strikes of Laura Washington Anderson (Venireperson 14) and Rolanda Wyette Brooks (Venireperson 29). (RR IV – 217). Providing race-neutral reasons for the strikes, the State's attorney explained that Ms. Anderson had described herself as "compassionate," and the prosecutor didn't want compassionate people on the jury. (RR IV – 217). He offered that he had struck the next venireperson, Laurie Martin Guest, for the same reason. (RR IV – 217).

Regarding Ms. Brooks, the State's attorney said he was "trying to get rid of as many teachers as I could…." (RR IV – 218). Referring to Ms. Brooks' voir dire statement that she would "see what their side is to see if they – if I can help them to talk to them to see where we can be at," the prosecutor explained that "who I'm trying to get off is somebody who is going to help people and be compassionate." (RR IV – 218). Finding the State had provided race-neutral bases for the strikes, the court denied the *Batson* challenges. (RR IV – 218).

**Guilt Phase**

In Appellant's opening argument, his counsel explained the defensive theory that Appellant believed that someone was going to steal his car. (RR V – 14). "We believe the evidence is going to show that Joshua Willis had no idea that there was a repossession order…." (RR V – 14).

The State's first witness was the named victim, Ernesto Lopez. (RR V – 16-66). On the time of the offense, Mr. Lopez was working for Texas Asset

Recovery, repossessing cars. (RR V – 17-18). On November 14, 2012, Mr. Lopez had gotten a repossession order on a Grand Marquis. (RR V – 18). The authorization order was entered as State's Exhibit 1. (RR V – 19). The authorization form described the car and identified the borrower as Frenda Loyd. (RR V – 19-20). Mr. Lopez testified that he had gotten information from the creditor that the car might be in the possession of Appellant. (RR V – 20). An informant had given Mr. Lopez information that the car might be in a "roundabout" area of East Waco. (RR V – 21-22). Searching the area on the day of the offense, Mr. Lopez found the car near a barber shop. (RR V – 22-23).

Mr. Lopez spotted the car driving towards him, and noted that the driver was looking at him, "kind of keeping an eye on me." (RR V – 23). Mr. Lopez circled the block and discovered on his return that the car had been parked. (RR V – 23). Mr. Lopez finding the car parked and unattended, hooked the vehicle to his tow truck, or "boomed it up." (RR V – 24-25). Mr. Lopez sponsored State's Exhibit 7, a photo which showed Mr. Lopez' tow truck clearly marked as "Texas Asset Recovery." (RR V – 27).

As soon as Mr. Lopez had gotten the car lifted off the ground, a man came running toward his truck and jumped in on the passenger side. (RR V – 28). Mr. Lopez made an in-court identification of the subject as the Appellant. (RR V – 29). As Appellant entered Mr. Lopez' truck, he was hollering at him that he had the wrong car. (RR V – 29).

Mr. Lopez showed Appellant the repossession order and tried to explain it to Appellant, but Appellant responded "No, you do not; that's the wrong car; that's the wrong car. (RR V – 30). Appellant then got into his car which had been hoisted into the air, turned it on and put it in drive. (RR V – 30-31). Mr. Lopez then put his truck in neutral so that Appellant's actions wouldn't harm the transmission of Mr. Lopez' tow truck. (RR V – 31). Appellant made two or three attempts, but was unable to drive off from the tow truck. (RR V – 31). Appellant then jumped into the passenger side of the tow truck. (RR V – 32). Appellant tried to grab Mr. Lopez' keys and struck Mr. Lopez two or three times. (RR V – 33-34). After fending off the blows from Appellant, Mr. Lopez grabbed Appellant. (RR V – 34). Using leverage, Mr. Lopez was able to pull Appellant out through the open driver's door. (RR V – 34-35). As Mr. Lopez started walking toward Appellant's vehicle, he was struck several more times in the back of the head. (RR V – 35). This scuffle resulted in Mr. Lopez falling to the ground, where Appellant bit him on the back. (RR V – 36). Throughout the assault, Appellant was yelling for Mr. Lopez to release the vehicle. (RR V – 36). When Appellant called to someone to "grab his gat," Mr. Lopez relented and told Appellant he would let the car down. (RR V – 36). Mr. Lopez went back to his truck and found that his keys were gone. (RR V – 36). Mr. Lopez did not know who gave him back his keys at that point, but he did not see anyone other than Appellant inside his truck. (RR V – 36-37). Mr. Lopez then let the car down. (RR V – 37). He did this

8

slowly, hoping the police would arrive. (RR V – 37). A crowd had gathered, and Mr. Lopez had been calling out for some to call the police. (RR V – 37). After the car was lowered, Appellant got in and drove off. (RR V – 38). The police arrived shortly thereafter. (RR V – 38). When the police arrived, the bystanders scattered. (RR V – 38).

During the scuffle, Mr. Lopez dropped his cell phone. Appellant grabbed the phone and started walking off with it. (RR V – 39). One of the bystanders stopped Appellant and persuaded him not to take Mr. Lopez' phone. (RR V – 39). Appellant gave the phone to the bystander, who returned it to Mr. Lopez. (RR V – 40, 66). The bystander also told Mr. Lopez Appellant's name. (RR V – 40). Mr. Lopez then sponsored photos of his injuries taken at the scene. (RR V – 41-44; State's Exhibits 12-21). After the incident, Mr. Lopez identified a photo of Appellant from a police line-up. (RR V – 48-49; State's Exhibit 22).

On cross-examination, Mr. Lopez stipulated his awareness that he was not allowed to breach the peace in repossessing a vehicle. (RR V – 55). He further testified that he had taken training to learn what constituted a "breach of the peace." (RR V – 56). Mr. Lopez disagreed with the defense attorney's assertion that his actions had constituted a breach of the peace. (RR V – 56).

The State called Frenda Willis Loyd, Appellant's mother. (RR V – 87-99). Ms. Loyd confirmed that she was the owner of the vehicle subject of the repossession, and that she had used the car as collateral for a payday

9

loan. (RR V – 91). She testified that Appellant did not receive any of the loan proceeds, and did not recall telling the State's attorneys otherwise. (RR V – 92). On cross-examination, Ms. Loyd testified that she had gotten these types of loans on numerous occasions, and that Appellant was aware of this. (RR V – 94). However, Appellant did not know about this specific loan. (RR V – 95).

Detective Sam Key of the Waco Police Department testified that the location where the offense occurred was a single-family dwelling containing a barber shop. (RR V – 131). Appellant lodged an objection and was allowed to approach. (RR V – 131-132). Outside the presence of the jury, Appellant specified an objection under Rules 404b and 403, claiming the evidence elicited improper character evidence and was more prejudicial than probative. (RR V – 132). On voir dire, Detective Key characterized the location as being a high drug traffic area. (RR V – 133). The court allowed the evidence on the State's assurance that it was only attempting to introduce evidence showing the nature of the location rather than Appellant's character as a drug dealer. (RR V – 133-135). Detective Key then testified to these matters before the jury. (RR V – 136-137). Appellant's Rule 404b/403 objection was overruled. (RR V – 137). Key then testified to his actions as the lead investigator in the case. (RR V – 137-139). He explained how he prepared a photo lineup which was subsequently administered by Detective Chavez. (RR V – 139-141). Detective Key also interviewed Ms. Loyd, who had told him she shared the loan proceeds

with Appellant. (RR V – 141-142). Ms. Loyd had told Key that she thought Appellant "paid that back." (RR V – 142). Detective Key had no doubt that Appellant knew about the loan on the car, and that Ms. Loyd in fact blamed Appellant for the repossession. (RR V – 142). Based on the findings of his investigation, Key obtained a warrant for Appellant's arrest. (RR V – 143).

Appellant called Jamon Johnson in his case-in-chief. (RR V – 164-184). Johnson worked as a barber at the location where the offense occurred. (RR V – 165). Johnson recalled Appellant being present on the day of the offense. (RR V – 165). Johnson was cutting hair when he saw a tow truck pass by. (RR V – 165-166). A number of people were in the shop, and they saw the tow truck pull up to Appellant's car. (RR V – 166-167). Johnson described an altercation between Appellant and the tow truck driver. (RR V – 167). Johnson went outside with a large group of people to see what was going on. (RR V – 167).

According to Johnson, Appellant's car was not hooked up to the tow truck. (RR V – 167). Johnson described a mutual combat between Appellant and the tow truck driver, which happened outside the cab of the tow truck. (RR V – 168). Johnson was evasive in answering Appellant's question as to whether the car was ever hooked to the tow truck. (RR V – 169-170). On cross-examination, Johnson was also evasive in identifying photographs of the scene and describing the tow truck. (RR V – 171-172).

11

He was also vague in owning up to his criminal record. (RR V 173-175). Johnson said he never saw Appellant biting Mr. Lopez. (RR V – 176).

**Jury Charge**

After the parties rested, the trial court held a colloquy regarding the jury charge. (RR V – 184-192). The court referred to Appellant's request for a mistake of fact instruction that, "the Defense had requested and which I had indicated off the record initially that I would include." (RR V – 185). The Court was concerned that "a mistake of fact has to negate a culpable mental state that constitutes the offense of theft. A culpable mental state is the intent to maintain control of the property and intentionally or knowingly causing bodily injury. How does this supposed belief that the Defendant had negate the intent to obtain and maintain control of the property[?] (RR V – 185).

The judge narrowed the focus of the colloquy to the question of what evidence raised the issue of mistake of fact. (RR V – 191). Appellant's counsel proposed that Ms. Loyd's testimony that Appellant did not know about the loan; and Mr. Lopez's testimony that Appellant told him "You've got the wrong car," raised the issue. (RR V – 191). The court denied the motion, agreeing with the State that Appellant's statement to Mr. Lopez indicated that Appellant understood that a repossession was in progress. (RR V – 192). After the mistake of fact defense was denied, the State put on record that the evidence also showed that Appellant took Mr. Lopez'

phone and the keys to his tow truck. (RR V – 196). Finally, the court allowed the inclusion of the lesser offense of assault. (RR V – 197-198).

**Closing Argument**

In Appellant's closing argument, his counsel argued that "[H]e's guilty of an assault, but he's not guilty of a theft…." (RR V – 213). State's counsel responded to Appellant's claim for the lesser-included offense in final closing argument, saying "they're asking you to find the lesser included – find him guilty of a lesser-included misdemeanor. Let me ask you. Do you all want him walking out this courthouse with you?" (RR V – 224). The court overruled Appellant's objection on the basis of improper argument. (RR V – 224).

The jury returned a guilty verdict. (RR V – 228-229).

**Punishment Phase**

In the punishment phase, Appellant pled true to the enhancement allegation of Delivery of a Controlled Substance in a Drug Free Zone. (RR VI – 17). The State then introduced evidence of Appellant's criminal history. (RR VI – 17; State's Exhibits 37-43). These included juvenile adjudications for Evading Arrest, Failure to Identify, Resisting Arrest, two felony counts of Retaliation, and felony Criminal Mischief. (RR VI – 17). Appellant had two felony convictions for Possession of a Controlled Substance, as well as the Delivery of a Controlled Substance enhancement prior. (RR VI – 17-18). Appellant had five prior misdemeanor convictions which included drugs, weapons, and assault charges. (RR VI – 18).

13

Finally, the State called eight peace officers who had worked numerous drug cases on Appellant in the past. (generally, RR VI; testimony of Ben Rush, Steve Mosley, Tim Davenport, Jeff Aguirre, Charles Herrin, Scott Vaughn, Anton Slavich and John Allovio.) Officer Allovio testified to his familiarity with the barber shop where the instant case occurred, describing it as a drug-dealing location; and with Appellant and Jamon Johnson as known drug dealers. (RR VI – 128).

**Punishment Argument**

In its final punishment closing argument, the State's attorney argued that "now that you've heard a little more about the barber shop and his dealings, maybe it's possible there was another reason he didn't want anybody getting in that car. Maybe there was dope in that car." (RR VI – 201). Appellant objected that the State was asking the jury to surmise something that was not in evidence. (RR VI – 201). The court overruled the objection. (RR VI – 201).

The jury assessed punishment at sixty years confinement. (RR VI – 207).

**Summary of Argument**

The court did not err in overruling Appellant's *Batson* challenges, as the State provided legally sufficient race-neutral bases for its peremptory strikes.

The court did not err in denying Appellant's requested instruction on mistake of fact, as such an instruction was not supported by the evidence.

The court did not err in overruling Appellant's objection to the State's permissible jury argument in the guilt phase.

The court did not err in overruling Appellant's permissible jury argument in the punishment phase.

**Argument**

*Batson* **Challenges**

Appellant's first point of error challenges the trial court's ruling on his *Batson* challenges. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). There are three steps in a *Batson* challenge. First, the opponent of the strike must make a *prima facie* showing of racial discrimination. Next, the proponent of the strike is given the opportunity to provide a race-neutral explanation for the strike. Finally, the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. *Purkett v. Elam*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed. 2d 834; *Young v. State*, 283 S.W. 3d 854, 866 (Tex. Crim. App. 2009).

An appellate court must sustain the trial court's ruling on the third step unless it is clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed. 2d 175 (2008). In the absence of exceptional circumstances, a reviewing court must defer to the trial court because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venirepersons, and this evaluation lies peculiarly within the province of the trial court. *Id.*; *Watkins v. State*, 245 S.W. 3d 444, 448 (Tex. Crim. App. 2008).

In the case at bar, the State exercised peremptory challenges to Venireperson 14, Laura Washington Anderson; and Venireperson 29, Rolanda Wyette Brooks. Appellant and both of these venirepersons are African-American. Anderson and Brooks were the only African-Americans remaining on the panel after strikes for cause. Appellant lodged *Batson* challenges to these two strikes.

During Appellant's voir dire, Ms. Anderson described her greatest weakness as "caring too much." (RR IV – 182). Providing a race-neutral reason for striking Ms. Anderson, the State's attorney explained that Ms. Anderson had described herself as "compassionate," and that he didn't want compassionate people on the jury. (RR IV – 217). He offered that he had struck the next venireperson, Laurie Martin Guest, for the same reason. (RR IV – 217).

State's counsel had asked the panel how they judged whether someone they had never met was being truthful. (RR IV – 51). Ms. Brooks said, "I don't know how I could prove they were guilty or innocent, just listen to them and see what their side is to see if they – if I can help them to talk to them to see where we can be at, and then I can't say they're innocent or guilty until they're proven." (RR IV – 52-53). As to the reason he struck Ms. Brooks, the State's attorney referred to this statement, explaining that "who I'm trying to get off is somebody who is going to help people and be compassionate." (RR IV – 218).

Various rulings have suggested guidelines for evaluating proper race-neutral rationales for exercising peremptory strikes in the face of a *Batson* challenge. *See, e.g., Keeton v. State*, 749 S.W. 2d 861, 865-869 (Tex. Crim. App. 1988); *Whitsey v. State*, 796 S.W. 2d 707 (Tex. Crim. App. 1990). However, these decisions have never held that any particular factor should be dispositive on the issue of discriminatory intent. While such factors may be considered, they do not replace the applicable standard, which is whether the trial judge's decision was supported by the record so that it is not clearly erroneous. *Grant v. State*, 325 S.W. 2d 655, 657 (Tex. Crim. App. 2010); *Vargas v. State*, 838 S.W. 2d 552 (Tex. Crim. App. 1992).

The record reflects that Appellant's counsel provided the panelists the opportunity to describe their main strength and weakness. Ms. Anderson considered that "caring too much" was her weakness. The next panelist, Laurie Martin Guest had described herself as a "compassionate person, and my weakness would probably be maybe caring too much or overworking." (RR IV – 182-183). While the State's counsel had confused Ms. Anderson's claim that she "cared too much" with Ms. Guest's claim to be a "compassionate person," the concepts are essentially the same. The State pointed out that it had used peremptory strikes on both panelists for the same reason.

In explaining why he struck Ms. Brooks, the State's counsel referred to her statement that "I don't know how I could prove they were guilty or innocent, just listen to them and see what their side is to see if they – if I can

17

help them to talk to them to see where we can be at, and then I can't say they're innocent or guilty until they're proven." The State wanted to eliminate "somebody who is going to help people and be compassionate."

The trial judge's decision to accept the State's race-neutral explanations was supported by the record, and it cannot be shown that the rulings were clearly erroneous. *Grant* at 657.

Applying the factors enunciated in *Keeton* and *Whitsey* also supports the trial court's ruling. These factors are: 1. The reason given for the peremptory strike is not related to the facts of the case; 2. There was a lack of questioning to the challenged juror or a lack of meaningful questions; 3. Disparate treatment; 4. Disparate examination of venire members; and 5. An explanation based on group bias that is not shown to specifically apply to the challenged juror. *Whitsey* at 713-714.

The State's evaluation of the panelists' character traits regarding caring, compassion and helping others had a strong bearing on their approach to judging a criminal case. This evaluation was based on specific responses given by the sticken panelists in response to voir dire questioning. The State struck other jurors for having similar attitudes about caring, compassion and helping others. The entire panel was asked the same questions. And the explanation for the strikes had nothing to do with a group bias or a group trait.

Appellant's first point of error is without merit and should be denied.

**Jury Charge Error**

Appellant claims in his second point of error that the trial court erred in denying his requested instruction on mistake of fact.

Review of a trial court's denial of a requested jury charge is for an abuse of discretion. *Wesbrook v. State*, 29 S.W. 3d 103, 122 (Tex. Crim. App. 2000). In analyzing a jury charge issue, the reviewing court must first determine whether error exists. *Ngo v. State*, 175 S.W. 3d 738, 743 (Tex. Crim. App. 2005). If error is found, it must then be determined whether the error caused sufficient harm to warrant reversal. *Id*.

A defendant is entitled to have the jury charged on every defensive issue raised by the evidence, whether that evidence be weak or strong, unimpeached or uncontradicted, and regardless of the trial court's opinion on the credibility of the defense. *Allen v. State*, 253 S.W 3d 260, 267 (Tex. Crim. App. 2008). It follows that if the issue is not raised by the evidence, the trial court may refuse to give the instruction. *Shaw v. State*, 243 S.W. 3d 647, 657-658 (Tex. Crim. App. 2007). A defense is supported or raised if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true. *Id*. The defendant bears the burden of showing the existence of some evidence supporting each element of the defense. *Juarez v. State*, 308 S.W. 3d 398, 404 (Tex. Crim. App. 2010); *Shaw* at 657-658. The evidence is viewed in the light most favorable to the requested instruction. *Bufkin v. State*, 207 S.W. 3d 779, 782 (Tex. Crim. App. 2006).

It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense. *Tex. Penal Code* §8.02(a). A reasonable belief is one that would be held by a reasonable and prudent person in the same circumstances as the actor. *Tex. Penal Code* §1.07(a)(42).

Where the alleged mistaken fact is a matter that is readily discernible by a simple empirical method of investigation that is universally accepted, a mistake of fact defense is not raised by the accused's failure to properly utilize that method. *King v. State*, 919 S.W. 2d 819, 821 (Tex. App. – El Paso 1996, *no pet.*); *Thibodeaux v. State*, 726 S.W. 2d 601, 604 (Tex. App. – Houston [14th Dist.] 1987, *pet. ref'd*); *Miller v. State*, 666 S.W. 2d 564 (Tex. App. – Houston [14th Dist.] 1984, *no pet.*).

In the case at bar, Appellant relied on the testimony of his mother that Appellant did not know about the loan; and Mr. Lopez's testimony that Appellant told him "You've got the wrong car," to raise the issue of a mistake of fact. The trial court agreed with the State's assessment that Appellant's statement to Mr. Lopez indicated that Appellant understood that a repossession was in progress. Referring to the indictment language, "while in the course of committing theft of property, and with intent to obtain and maintain control of said property …," the State made the additional point that the property at issue was not limited to the repossessed car. The evidence also showed that Appellant had taken Mr.

Lopez' phone and the keys to his tow truck. Any mistake of fact regarding possessory rights to the car did not affect Mr. Lopez' phone and keys.

In order to claim a mistake of fact defense, Appellant must have formed a reasonable belief about the fact in issue. *Tex. Penal Code* §§1.07(a)(42), 8.02(a); *Thibodeaux* at 604. There was no evidence to support a mistake of fact regarding the possessory rights of Mr. Lopez' phone and keys. The trial court determined that Ms. Loyd's assertion that Appellant was unaware of the underlying loan and Appellant's exclamation to Mr. Lopez that he "had the wrong car" were not evidence of such a reasonable belief. At best, this claim is nebulous. As such, the trial court did not abuse its discretion in denying the requested charge.

Finally, Appellant's alleged mistake of fact would have been easily discernible by the simple empirical method of looking at the repossession order he was being shown by Mr. Lopez, reading the signage on Mr. Lopez' tow truck, or listening to Mr. Lopez' assertions. *King* at 821; *Thibodeaux* at 604; *Miller* at 566.

The trial court did not err in refusing a mistake of fact instruction, and Appellant's second point of error is without merit.

**Improper Argument**

In his third and fourth points of error, Appellant claims the trial court erred in overruling his objections to the State's jury argument in the guilt phase and the punishment phase.

21

A trial court's ruling on an objection to improper jury argument is reviewed for abuse of discretion. *Garcia v. State*, 126 S.W. 3d 921, 924 (Tex. Crim. App. 2004). Proper areas of jury argument are: 1. Summation of the evidence, 2. Reasonable deductions from the evidence, 3. Answers to argument of opposing counsel, and 4. Pleas for law enforcement. *Brown v. State*, 270 S.W. 3d 564, 570 (Tex. Crim. App. 2008). Counsel is generally given wide latitude in drawing inferences from the evidence as long as they are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W. 2d 396, 398 (Tex. Crim. App. 1988).

Appellant claims error in overruling his objection to the State's argument against finding a lesser included offense. The record is clear that Appellant argued for consideration of the lesser included offense of assault in his closing argument. The State's argument occurred in final argument, and was made in response to Appellant's argument. This was clearly an answer to the argument of opposing counsel. *Brown* at 570. The State's rhetorical statement, "Do you all want him walking out this courthouse with you?" could further be characterized as a plea for law enforcement within the limitations of reasonable, fair, legitimate argument offered in good faith. *Gaddis* at 398. It cannot be shown that the trial court abused its discretion in overruling the objection to this State's argument. Appellant's third point of error should therefore be denied.

In the punishment phase, the State introduced a plethora of evidence concerning Appellant's prior convictions and pending charges for drug

dealing. In closing punishment argument, State's counsel proposed that a possible reason for the robbery was because drugs might be in the car. Certainly a large amount of uncontroverted evidence was presented in the punishment phase showing Appellant's involvement in drug dealing. The evidence further showed that the barber shop where the offense occurred was a location known to law enforcement for its illegal drug traffic. In light of this adduced evidence, the State's argument was a reasonable deduction.

Even if jury argument falls outside the permissible categories, an appellate court should not reverse unless the error is harmful. *Mosley v. State*, 983 S.W. 2d 249, 259 (Tex. Crim. App. 1998). Improper jury argument must be disregarded unless it affected the defendant's substantial rights. *Tex. R. App. P.* 44.2(b); *Martinez v. State*, 17 S.W. 3d 677, 692-693 (Tex. Crim. App. 2000). In determining whether the defendant's substantial rights were affected, the reviewing court considers 1. The severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); 2. The measures adopted to cure the misconduct (the efficacy of any cautionary instructions by the judge); and 3. The certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley* at 259.

If the complained-of argument was improper, it cannot be characterized as severe. The arguments were within the range of the trial evidence and reasonable inferences which could be drawn from the evidence. Obviously there were no curative instructions from the trial

court since the objection was overruled.  But it cannot reasonably be argued that the sentence assessed was due to the prosecutor's inferential argument as to Appellant's motive.  The raw evidence of Appellant's deep involvement in drug trafficking was clearly the determinative factor.

Appellant's fourth point of error is without merit.

## Prayer

For the foregoing reasons, the State of Texas prays that this Honorable Court affirm the conviction and punishment of JOSHUA MARQUES WILLIS for the offense of ROBBERY (ENHANCED), and prays for such other and further relief as may be provided by law.

Respectfully Submitted:
**ABELINO 'ABEL' REYNA**
Criminal District Attorney
McLennan County, Texas

/s/ Sterling Harmon
**STERLING HARMON**
Appellate Division Chief
219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
sterling.harmon@
co.mclennan.tx.us
State Bar No. 09019700

## Certificate of Compliance

This document complies with the typeface requirements of *Tex. R. App. P.* 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of *Tex. R. App. P.* 9.4(i), if applicable, because it contains 5,943 words, excluding any parts exempted by *Tex. R. App. P.* 9.4(i)(1).

## Certificate of Service

I certify that I caused to be served a true and correct copy of this State's Brief by E-Filing Service on Appellant's attorney of record.


DATE: 6/9/15____                                    /S/ STERLING HARMON_____

                                                    STERLING HARMON